UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

AURUBIS BUFFALO, INC., f/k/a
LUVATA BUFFALO, INC., and AIG EUROPE,
S.A. in its own right and/or as assignee/subrogee
of Luvata Buffalo, Inc., Luvata Oy f/k/a Luvata
Holding Oy and Luvata International Oy,                          **REPORT,**
                                                                **RECOMMENDATION**
                              Plaintiffs,                       **and ORDER**

v.                                                              08-CV-00034(A)(M)

LOMBARD GENERAL INSURANCE COMPANY
OF CANADA, AVEC INSURANCE MANAGERS,
INC., UNISON INSURANCE AND FINANCIAL
SERVICES, INC. and BOYD INTERNATIONAL
CONSULTANTS, INC.,
                              Defendants.

_____

        This case has been referred to me by Hon. Richard J. Arcara to for supervision of

pretrial proceedings [62].[1]  Before me are: (1) motions for summary judgment by plaintiffs

Luvata Buffalo, Inc. ("Luvata") [107][2] and AIG Europe, S.A. ("AIG") [103]; (2) a cross-motion

for summary judgment by defendants Lombard General Insurance Company of Canada

("Lombard") and Avec Insurance Managers, Inc. ("Avec") [109]; (3) AIG's motion to amend the

Case Management Order [119]; and (4) AIG's motion to strike Lombard' expert affidavit, expert

designation, and various exhibits [136].

        Oral argument was held on December 19, 2011 [161] and February 9, 2012 [160].

By Notice dated February 13, 2012 [158], I asked the parties to address another potential ground

_____

        [1]        Bracketed references are to CM-ECF docket entries.

        [2]        Luvata was recently acquired by Aurubis Buffalo, Inc., and the caption has been
amended accordingly [166, 168].

for summary judgment, and following their responses [162-165], further oral argument was held on March 16, 2012 [167].

For the following reasons, I recommend that Lombard/Avec's cross-motion for summary judgment [109] be granted, and that the motions for summary judgment by Luvata and AIG [103, 107] be denied. Subject to adoption of that recommendation, I further order that AIG's motions to amend the Case Management Order [119] and  to strike [136] be denied as moot.

## BACKGROUND

This dispute involves insurance coverage for a shipment of copper cathodes ordered by Luvata. On or about March 20, 2007, Luvata contracted with MIH Scrap Metals International LLC ("MIH") to purchase 1,500 metric tons ("MT") of copper cathodes for use in its Buffalo facility.  Burghardt Affidavit [103-1], Ex. N.  In anticipation of that purchase, on December 14, 2006 Luvata entered into a Service Agreement with defendant Boyd International Consultants, Inc. ("Boyd") [111-1], pursuant to which Boyd was obligated to "[o]versee transactions and monitor all parties providing services", "check for compliance of goods with terms of purchase order", and "[t]hrough licensed brokers and underwriters, assist in procuring marine cargo, transit and other relevant insurance".

Under Luvata's agreement with Boyd, all insurance services were to be provided by defendant Unison Insurance and Financial Services, Inc. ("Unison") Id.  Boyd obtained for Luvata a Marine Insurance Policy issued by Lombard and underwritten by Avec [103-20].[3]

_____

[3]     While the record contains multiple copies of the policy, I will refer to the copy at [103-20].

MIH contracted with Mitsui O.S.K. Lines, Ltd. ("MOL") to ship the first 500

metric tons of copper cathodes from the port at Dar Es Salaam, Tanzania to the port at Montreal,

Canada. Burghardt Affidavit [103-1], Ex. V.  Madini Asili (T) Ltd. and Inchcape Shipping

Service were MOL's shipping agents. Id. Boyd selected Intertek Group ("Intertek") to inspect

the copper in Africa prior to its being loaded for shipment to Luvata. Eusanio Affidavit [103-26],

Ex. H.

On July 19, 2007, Luvata received a e-mail from James Boyd stating that "[w]e

have received confirmation that 25 containers representing 500 MT of copper cathodes have been

inspected and sealed by Intertek at the port of Dar es Salaam.  According to our information, this

shipment is consigned to Luvata, which puts your insurance into effect."  Burghardt Affidavit

[103-1], Ex. P.

The shipment of copper cathodes sailed from the port of Dar es Salaam, Tanzania

on July 24, 2007.  Id.  Based upon various documents, including MOL's bill of lading issued

from Dar Es Salaam on July 25, 2007 indicating that the freight included 25 containers of copper

cathodes and Intertek's reports and certifications dated July 16 -19, 2007, on August 1, 2007

Luvata wire transferred to MIH the sum of $3,777,036.06 in payment for the shipment.

Burghardt Affidavit [103-1], ¶¶15, 17-20, 24, exs. V, W, X, Y, Z.

Luvata later learned that there was a *second* set of documents, describing the

contents of the containers as "gemstones", which were submitted to the government authorities in

Tanzania.  Id., ¶¶34, 35, exs. CC (Loading List dated July 21, 2007), DD (Inchcape Shipping

Services Shipping Order), EE (Export Report for Precious Minerals). However, upon arrival of

the shipment it was discovered that the "containers contained neither copper plates, nor

gemstones . . . . [T]he drums were mostly filled with worthless sand, dirt and pebbles." Eusanio

Reply Affidavit [130], Ex. NN, p. 4.

Following notification by Luvata concerning these developments, both AIG

(which had issued an extended crime insurance policy to Luvata) and Lombard conducted their

own investigations into the circumstances surrounding the shipment. AIG's investigator

concluded that "there appears to be little doubt that various parties colluded with each other

to defraud the Insured of a payment of USD 3,777,036.06 for copper cathodes that never

existed. The Inspection certificates provided by Intertek to Luvata were false, as was the Bill of

Lading . . . . [T]he true consignment consisted of worthless minerals (rocks), not the copper

cathodes the Insured believed they were purchasing". Charles Taylor Adjusting report [162-1],

p. 9.

Lombard's investigation reached essentially the same conclusion: "Intertek's

documentation . . . are all forged documents . . . . It appears therefore that there was collusion

among the shipper, Intertek Caleb Brett's staff and shipping agents staff . . . . [W]e are satisfied

that it was gemstones which were loaded into the . . . containers and not copper cathodes". Toplis

& Harding report [130-4], pp. 6, 7, 8.

By letter to Luvata dated November 7, 2007 (Burghardt Affidavit [103-1], Ex.

HH), Lombard disclaimed coverage for the loss. AIG paid Luvata and/or its parent or affiliated

companies the sum of $3,938,869.43 (consisting of the amount paid for the copper cathodes and

Luvata's investigative and storage costs and attorney's fees).  Burghardt Affidavit [103-1], Ex.

JJ; Intervenor Complaint [22], ¶9.  On September 19, 2008 Luvata assigned to AIG the right to

seek recovery from Lombard/Avec and/or any responsible party the amount which it had reimbursed to Luvata.  Burghardt Affidavit [103-1],  Ex. KK.

On January 16, 2008, Luvata commenced this action against Lombard, Avec, Unison and Boyd, and Luvata amended its Complaint by stipulation on June 25, 2008. Complaint [1]; Amended Complaint [12].[4]  Luvata  asserts causes of action against Lombard and Avec for breach of the Lombard Policy (first cause of action), reformation of the Lombard Policy to reflect the Specification Compliance Insurance extension limits equal $500,000 per container (second cause of action), equitable estoppel based upon the representations of  Boyd, Lombard's designated  representative, on July 19, 2007 that the copper cathodes were inspected and sealed by Intertek and that its insurance coverage through Lombard was in effect for the shipment of copper (fourth cause of action), and bad faith (seventh cause of action).  Amended Complaint [12].

AIG's Intervenor Complaint[5] seeks a declaratory judgment that Lombard is the primary insurer of Luvata's loss (first cause of action), and indemnification, reimbursement, contribution and/or apportionment from Lombard for the amounts it paid to Luvata for its loss (second and third cause of action).  Intervenor Complaint [22].

AIG seeks summary judgment against Lombard and Avec (1) that the Lombard Policy covers Luvata's loss paid by AIG in the sum of $3,938,869.43, plus interest, costs and

---

[4]       The related case of Luvata Buffalo, Inc. v. MOL Motsui O.S.K. Lines, Ltd., et al. (8-cv-701)(A)(M)) has settled, and the related case of AIG Europe, S.A. v. MIH Scrap Metals International, LLC, et al., (9-cv-612(A)(M)) has also settled, with the exception of the claims asserted against the MIH Scrap Metals defendants.  The claims against these defendants have been administratively closed because of their bankruptcy [96].

[5]       The parties stipulated to permit AIG to intervene and to be joined or substituted as a party plaintiff [21].

attorney's and investigation fees, (2) that the Lombard Policy affords primary coverage to Luvata and that the AIG Policy provides excess coverage, and (3) for indemnification or reimbursement under the Lombard Policy. AIG's Notice of Motion [103]. Alternatively, AIG seeks summary judgment against Lombard and Avec for contribution or apportionment under the Lombard Policy for Luvata's loss as paid by AIG, plus interest, costs and fees. Id. Without raising any independent arguments, Luvata has adopted AIG's arguments and seeks its unreimbursed losses in its summary judgment motion [107].

Lombard and Avec cross-move for summary judgment for a declaration that they are not required "to provide any coverage, payment or compensation to [plaintiffs]" and for dismissal of Luvata's bad-faith claims. Lombard's Notice of Cross-Motion [109], p. 2. In response to that cross-motion, AIG has moved to amend and extend the deadlines of the Case Management Order [119] and to strike an expert affidavit and designation along with additional exhibits offered by Lombard and Avec [136]

## ANALYSIS

**A.     The Lombard Policy Clauses at Issue**

The parties agree that only the following clauses of the Lombard policy are at issue in this case:

**1.     The "Fraudulent Bills of Lading" Clause**

The Lombard policy's "Fraudulent Bills of Lading" clause ([103-20], p. 7 of 36) consists of two sentences, each containing slightly different coverage provisions. The first

sentence "covers physical loss incurred by the Assured through the acceptance by the Assured, its

Agents or the shipper of fraudulent bills of lading, shipping receipts, messenger receipts,

warehouse receipts, or other shipping documents". Thus, in order for this coverage to apply,

Luvata must have sustained a "physical loss" which was "incurred  through" its acceptance of

fraudulent bills of lading or similar documents.

That did not occur. In the first place, the payment which Luvata made in reliance

on the bills of lading and other documents (assuming they were fraudulent) was not a physical

loss (*i.e.*, a loss of the copper) - it was a financial loss, which is not the same. *See* <u>Federowicz v.</u>

<u>Potomac Insurance Co. of District of Columbia</u>, 7 A.D.2d 330, 336 (4th Dep't 1959) ("the

pertinent clause in the policy should be interpreted upon the basis that this was insurance against

physical loss and not against financial loss").

Secondly, even if there had been a physical loss of the copper, that loss cannot

have been "incurred through" Luvata's acceptance of  fraudulent documents. Only two scenarios

are possible: either the shipment contained copper at the time Luvata accepted the documents, or

it did not. If it did, then the documents were not fraudulent. If it did not, then the "physical loss"

of the copper (if indeed it ever existed) would have occurred *prior* to Luvata's acceptance of the

documents, and therefore could not have been incurred "through" that acceptance.

The second sentence of the clause covers "loss or damage caused by the

utilization of legitimate bills of lading and/or other shipping documents without the authorization

and/or consent of the Assured or its Agents".  Thus, while the loss need not be a physical loss in

order to be covered under this provision, it must result from the use of "legitimate" documents.

As noted by Lombard/Avec's counsel during oral argument on March 16, 2012, the documents

upon which Luvata relies were not "legitimate", because they described the shipment contents as

"gemstones", whereas Luvata had ordered copper.[6]

Therefore, there is no coverage under the "Fraudulent Bills of Lading" clause.


2.    The "All Risks" Clause

The "all risks" clause of the Lombard policy states that, with limited exceptions,

"[t]his insurance covers all risks of loss of or damage to the subject-matter insured" ([103-20], p.

19 of 36, ¶1). The "subject-matter insured" is elsewhere defined as "the insurable interest of the

Assured on: Electrolytic Copper Cathodes" (id., p. 5 of 36). However, ¶8.1 of the "all risks"

coverage states that "[t]his insurance attaches from the time the goods leave the warehouse or

place of storage . . . for the commencement of transit" (id., p. 19 of 36).

AIG argues that the Lombard policy's "broad voyage clause establishes coverage

without the need for 'commencement of transit'".  AIG's Memorandum of Law [133], p. 19

(citing Farr Man Coffee Inc. v. Chester 1993 WL 248799, **38-39 (S.D.N.Y. 1993), aff'd, 19

F.3d 9 (2d Cir. 1994)). For three reasons, I disagree. First, the court's analysis in Farr Man was

dicta, since the argument for non-coverage had been waived.[7] Secondly, the language of the

voyage clause in Farr Man "provide[d] that coverage attaches from the time the subject matter

becomes at the Assured's risk or the Assured assumes interest and continues whilst the subject

---

[6]        In any event, it appears that the shipment did not even contain gemstones. See Eusanio
Reply Affidavit [130], Ex. NN, p. 4.

[7]        "The second prong of the inland-operation defense involves the Underwriters' contention
that the risks associated with inland operations are outside the scope of Policy coverage. This defense,
which the Underwriters waived, is also without merit." 1993 WL 248799, *38.

matter is in transit". <u>Id.</u> By contrast, the Lombard policy's voyage clause ([103-20], p. 5 of 36) merely states "[a]t and from ports and places in the world to ports and place in Canada . . .", and does not itself create coverage.

Third, even if there were a conflict between the voyage clause and ¶8.1 of the "all risks" coverage, ¶8.1 would control, since it specifically relates to that coverage. "[I]t is a familiar principle of legal construction that the specific provisions of a contract are to be given preference over the general provisions, and if there is a conflict between the two any reconciliation should give full effect to the more specific." <u>Ferguson v. Hannover Ruckversicherungs-Akteiengesellschaft</u>, 2007 WL 2493692, *15 (S.D.N.Y. 2007).

It is undisputed that by the time the shipment left the warehouse, it did not contain the copper in which Luvata had an insurable interest. As AIG's attorney stated at oral argument, "the likelihood, as everyone concluded, is nil that somebody took out 1.1 million pounds of copper in the warehouse and switched it with rocks. This was a fraud, plain and simple" ([160], p. 8). Therefore, by its own terms, the "all risks" coverage never attached.

> 3.     **The "Specification Compliance Insurance Extension"**

Lombard's "Specification Compliance Insurance Extension" provides that:

> "In consideration of the additional premium charged, it is agreed
> that this policy is extended to cover the interest of the Insured in
> the merchandise covered.  Should the buyer determine that the
> merchandise shipped does not comply with the minimum
> acceptable manufacturing / processing standards as set forth in the
> purchase order under the terms of the open policy and shipment is
> not accepted as a result." ([103-20], p. 12 of 36, ¶2).

This coverage was "[t]o attach upon commencement of transit FOB vessel" (id., ¶6, p. 13 of 36), that is, "once the FOB vessel . . . began its voyage on or about July 25, 2007". AIG's Memorandum of Law [133], p. 21. Since it is undisputed that the copper was not on board by the time the vessel began its voyage, there is no coverage under this provision.

**B.    Boyd's Representations as to Coverage**

Notwithstanding the language of the Lombard policy,  AIG argues that "Lombard and Avec, *by their agent* and specifically identified 'Designated Representative' Boyd International Consultants, Inc., acknowledged that the Lombard Policy was put 'into effect' irrespective of any 'transit,' or 'attachment' clauses."  AIG's Memorandum of Law [133], p. 10. AIG relies upon Boyd's July 19, 2007 e-mail stating that "this shipment is consigned to Luvata, *which puts your insurance into effect*". Id. (emphasis added).

However,  the Specification Compliance Insurance Extension designated Boyd as Lombard's "representative" solely for the purpose of inspecting the goods prior to shipment. *See* [103-20], p. 12 of 36, ¶3; pp. 14 and 15 of 36, ¶¶14(A), (C). For all other purposes, Boyd was Luvata's agent. *See* December 14, 2006 Service Agreement between Boyd and Luvata [111-1], pursuant to which Boyd was required to "[o]versee transactions and monitor all parties providing services", "check for compliance of goods with terms of purchase order", and "assist in procuring marine cargo, transit and other relevant insurance" (id., p. 1).

Therefore, Boyd had no authority to bind Lombard by any representation that the insurance was in effect.[8]

## C.     Other Arguments and Motions

Lombard/Avec also raises additional grounds for summary judgment, such as that Luvata and AIG lack standing to seek recovery under the Lombard policy. In light of my conclusion that there would be no coverage in any event, I do not address these arguments. Moreover, in light of my recommendation, AIG's motions to amend the Case Management Order [119] and to strike Lombard/Avec's expert submissions and exhibits [136] are moot.

## CONCLUSION

For these reasons, I recommend that Lombard/Avec's cross-motion for summary judgment [109] be granted, and that the motions for summary judgment by Luvata and AIG [103, 107] be denied. Subject to adoption of that recommendation, I further order that AIG's motions to amend the Case Management Order [119] and to strike [136] be denied as moot.

Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by April 9, 2012 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to

---

[8]     In fact, the Service Agreement between Boyd and Luvata clearly stated that Luvata "shall rely upon its own independent review of . . . the actual terms of the insurance policies and not upon any information or description from [Boyd]. The terms of the insurance policies supersede and replace any prior description thereof." [111-1], p. 2.

object timely . . . waives any right to further judicial review of [this] decision". <u>Wesolek v. Canadair Ltd.</u>, 838 F. 2d 55, 58 (2d Cir. 1988); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. <u>Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: March 22, 2012                          /s/ Jeremiah J. McCarthy
                                               JEREMIAH J. MCCARTHY
                                               United States Magistrate Judge